# CHARLESTON.

## HEAVNER *v*. MORGAN *et al.*

Submitted June 15, 1895—Decided Dec. 4, 1895.

1. FAILURE OF CONSIDERATION—PURCHASE-MONEY NOTE—INSOLVENT VENDOR.

   Where a party, by his title bond, covenants to sell a tract of land with general warranty, describing it as containing a certain number of acres, and the vendee executes to him his bonds for the purchase money, one of which is assigned to a third party, and it is subsequently ascertained that there is a material deficiency in the quantity of the land, and it further appears that the vendor is insolvent, a court of equity will not require such vendee to complete his purchase by paying his said single bill, and to rely upon the hazard of recovering the money so paid from his insolvent vendor.

2. ADVERSE POSSESSION.

   Possession, in order to be adverse, must be (1) hostile or adverse; (2) actual; (3) visible, notorious, and exclusive; (4) continuous; (5) under claim or color of title.

3. ADVERSE POSSESSION—INCLOSURES—COLOR OF TITLE.

Where a party goes beyond the limits of the land described in his deed, and claims to hold the same advers ly, unless he does so under color or claim of title he is limited to his inclosures.

4. PROMISSORY NOTE—DECLARATIONS OF MAKER—PREPONDERANCE OF TESTIMONY.

Where a party became the purchaser of a single bill, and claims that before purchasing the same, he informed the maker of his intention, and such maker replied it was all right, and that he would as soon pay him as the original payee, which is denied by the maker, such claim must be sustained by a preponderance of testimony to constitute an estoppel.

C. C. HIGGINBOTHAM for appellant, cited 3 Call, 239; 4 H & M. 125; 30 W. Va. 335; 2 Minor, 509; 1 Gratt. 165, 223; 11 Gratt. 427, 587; 22 Gratt. 392; C. R. 229; 7 Rob. Pr. 446-59.

A. M. POUNDSTONE for appellees, cited 5 Leigh, 606; 5 W. Va. 285; 14 W. Va. 238; 7 Gratt. 399; 3 Leigh, 161; 18 Gratt. 660; 24 W. Va. 214, 524; 3 Rand. 44; 21 W. Va. 326.

ENGLISH, JUDGE:

This was a suit in equity, instituted by Elias Heavner against the defendants, Morgan Morgan *et al.*, in the Circuit Court of Upshur county, which had for its object the collection of a certain single bill which was executed by the defendant Morgan Morgan to W. G. L. Totten, for the sum of three hundred and twenty five dollars, dated the 14th day of October, 1874, and payable two years after date, with interest from date, which single bill was on the 14th day of October, 1875, assigned, for value received to said Elias Heavner. The plaintiff, in his bill, prayed for a specific performance of the contract, and that the land might be sold to satisfy said single bill.

The defendant Morgan answered, exhibiting the title bond executed to him by said Totten, in which he covenanted, for the consideration therein mentioned, to convey the tract of land therein described, containing two hundred and three acres, to said Morgan, with covenants of general warranty. He alleges that all of the bonds executed by him to said Totten for said tract of land have been paid off and discharged, with the exception of said

three hundred and twenty five dollar bond, assigned to plaintiff by said Totten; that there was a deficiency in the quantity of said tract of land; that the sale to him was a sale by the acre, and that such deficiency would amount to thirty five acres and one hundred and twelve poles; that he has already paid and overpaid for the true quantity of the land sold to him by said Totten, and is entitled to recover the surplus from him, and have said bond for three hundred and twenty five dollars canceled; that something over a year after his said purchase from said Totten, he learned that there were not two hundred and three acres of land in said tract; that part of said land was owned by James Ross, and part by Mrs. Ely, and, as soon as he learned this fact, he so informed said Totten. At first said Totten claimed that he owned all the land he had sold to said defendant, but afterwards he admitted that Mrs. Ely and James Ross would hold those parts claimed by them, which had been embraced in said contract, and said Totten made an effort to purchase said parts from said Ross and D. D. T. Farnsworth, agent of Mrs. Ely, but failed to do so.

On the 18th day of February, 1882, the cause was referred to a commissioner, to ascertain what amount of purchase money had been paid on the land in the bill mentioned, and to whom, and to ascertain and report whether the deed filed with the bill embraces land not owned by the defendant W. G. L. Totten at the time of his sale to the defendant Morgan Morgan, the true quantity of the land owned by said Totten in the tract sold by him to Morgan Morgan in the bill mentioned, and ascertain the true metes and bounds thereof, empowering said commissioner to do the necessary surveying, *etc.*

Numerous depositions were taken before said commissioner in behalf of the plaintiff and defendant. Surveying was done, and a plat and a report returned. Said commissioner found that said Morgan Morgan paid to the said Totten all of the purchase money for said land except the three hundred and twenty five dollars, to enforce the payment of which this suit was brought. Said commissioner also found that the deed filed with plaintiff's bill does not em-

brace land not owned by the defendant W. G. L. Totten at the time of his sale to the defendant Morgan Morgan; that the true quantity of the land owned by said Totten, and sold by him to Morgan Morgan, in the bill mentioned, is two hundred and seventeen and one half acres, estimated by surface measurement, or two hundred and four and one half acres if estimated by horizontal measurement, and the plat of the surveyor is returned with said report, which the commissioner finds to be the bounds of the tract sold by said Totten to Morgan Morgan.

The defendant Morgan excepted to said commissioner's report so far as it found that the deed filed with plaintiff's bill does not embrace any land not owned by the defendant Totten at the time of his sale to the said Morgan, and so far as it found the quantity of the land sold and conveyed by Totten to him to be two hundred and seventeen and one half acres.

Other depositions were taken in the cause, and on the 14th day of February, 1885, the cause was heard, and a decree rendered, sustaining the exceptions to the commissioner's report filed by said Morgan thereto, and dismissing the plaintiff's bill, with costs, and directed that said Totten should convey said land to said Morgan Morgan conforming to and following the lines represented of Watson Westfall.

From this decree an appeal was taken to this Court, which on the 12th day of November, 1887, resulted in reversing said decree, with costs, and remanding the case, with leave to amend his bill. See 30 W. Va. 335 (4 S. E. 406).

The death of Elias Heavner having been suggested, the cause was revived in the name of Jacob W. Heavner, his executor; and the said executor filed an amended bill against Morgan Morgan, W. G. L. Totten, James Ross, Anderson Shingleton, and Fannie H. Ely, in which he commences at the original patent for thirty thousand acres of land issued on the 25th day of June, 1794, to John Davenport and others, which land is alleged to have been located in Harrison county, but now in the county of Upshur, and, tracing the title down to the present owners,

alleges: That in the year 1818 said tract of land was transferred from the land books of Harrison county to the land books of Lewis county, in the name of John Davenport & Co., that being the county in which said land was then located. That the sheriff of Lewis county returned said tract of land as delinquent for the non-payment of the taxes thereon for the years 1818 to 1833, inclusive. That on the 27th day of September, 1837, the Circuit Superior Court of Law and Chancery for Lewis county made an order by which it appointed Minter Bailey commissioner of forfeited and delinquent lands for Lewis county. That on the 20th of May, 1840, said commissioner made to said court a report of said tract of land as forfeited, and on the same day said court made an order by which it directed the said commissioner to sell said tract; and afterwards, on the 26th day of June, 1840, the judge of said court, in vacation, made another order, directing said commissioner, he being the surveyor of lands for said county, to send Robert Ervin, his deputy, on said tract of land to survey and locate the same. That, in pursuance of said order, said deputy surveyor went on said tract of land and divided the same into thirty lots, numbered from 1 to 30, inclusive, principally by protraction; but he actually ran and marked some of the interior lines, and reported the same to the court with two fair plats, all of which lots appear to have been laid off rectangular in shape, by parallel lines, with the exception of those numbered from 1 to 6, inclusive. On the second Tuesday in August, 1840, said commissioner sold said thirty lots at the front door of the court-house of said county at public auction, at which sale the said Robert Ervin became the purchaser of lots 10, 11, 13, 14, 23, and 24, which sale was afterwards confirmed by the court. On the 10th day of December, said Minter Bailey, as commissioner, conveyed lots 10, 11, 13, 14, 23, and 24 to Robert Ervin, John McWhorter, and Alexander S. Withers; and on the 20th day of August, 1851, said Robert Ervin and wife conveyed their undivided third of said six lots to John McWhorter. That, some time in the year 1851, said John McWhorter and Alexander S. Withers conveyed said lot number 14 to Leonard Crites, first by

deed conforming to the original plat, which said Crites refused to receive, and afterwards said McWhorter and Withers conveyed said lot No. 14 to said Leonard Crites by deed without metes and bounds. That all of said six lots adjoin each other, and the said McWhorter and Withers were the owners of all said lots when they sold said lot No. 14 to Leonard Crites. That said Leonard Crites, in taking possession of said lot No. 14, got over on to the interlock which was afterwards made by A. D. Peterson attempting to run the line between lots 14 and 23 at the instance of said Leonard Crites; and said Crites, for a time, claimed the boundaries of said lot No. 14 as run by said Peterson, and made some improvement on the interlock. The said Leonard Crites devised to his two sons, John D. and William M. Crites, a part of said lot 14, to wit, a tract containing two hundred and three acres; and, on the death of their father, it is alleged they took possession of said tract, which lies adjoining said lots 13 and 23, and is divided from the remaining portion of lot 14 by the Buchanan river. Said John D. and William M. Crites, on the 8th day of September, 1870, sold and conveyed said tract of land to Thomas Selby, and on the 14th day of October, 1874, C. C. Higginbotham, special commissioner in the chancery cause of A. B. Clark against Thomas Selby and others, then pending in the County Court of Upshur county, sold said tract of land, at which sale W. G. L. Totten became the purchaser thereof, at the price of two thousand one hundred and seventy five dollars, on the 10th day of October, 1874, which sale was afterwards confirmed; and on the 14th day of October, 1874, said W. G. L. Totten sold said tract of land to said Morgan Morgan for two thousand five hundred dollars, of which the said Morgan paid five hundred and fifty dollars in cash, and executed to the said Totten four single bills, dated the 14th day of October, 1874, bearing interest from date—one for four hundred and sixteen dollars and sixty six and two thirds cents, due the 14th of April, 1875; the second for six hundred and four dollars and sixteen and two thirds cents, due on the 14th day of October, 1875; the third for six hundred and four dollars and sixteen and two thirds cents due on

the 14th of April, 1876; and the fourth for three hundred and twenty five dollars, due on the 14th day of October, 1876. That the said Morgan Morgan, on the 14th day of October, 1874, took actual possession of said tract of land within the interlock, on the side of said lot 13, as well as the balance of said tract, and from that time to this has held actual, continuous, and exclusive possession of said tract of land and of the interlock, claiming title to the whole of said tract to the extent of the metes and bounds set forth in the deed from John D. and William M. Crites and others to Thomas Selby. Said Higginbotham subsequently conveyed said tract of land to said Totten, and said Totten conveyed the same to Morgan Morgan, with covenants of general warranty, and tendered him the deed, which he refused to accept. That the said John McWhorter, on the 4th day of September, 1868, conveyed said lot No. 23 to said Fanny H. Ely, and said John McWhorter conveyed to James Ross that part of lot 13 adjoining lot 14. That said James Ross, John McWhorter, or Alexander S. Withers never had any possession of said lot 13, or any part thereof. That James Ross took possession on the 17th of November, 1873, of that portion thereof outside of the interlock, but never has had possession inside of said interlock. That afterwards said James Ross conveyed part of said lot 24 to said Anderson Shingleton; and that said Shingleton has never had possession of any part of said interlock; and that on the 11th day of October, 1875, C. W. Heavner, the son of the said Elias Heavner, asked the said Morgan Morgan if he should buy said single bill for three hundred and twenty five dollars from said W. G. L. Totten forhis father, if he (the said Morgan) would have any objection, and thereupon the said Morgan Morgan stated that the single bill was all right. That afterwards the said Totten, for and in consideration of the full face value of said single bill, assigned the same to the said Elias Heavner. That in January, 1876, the said Elias Heavner notified said Morgan Morgan that said Totten had assigned him said single bill. That, after said notice was served on said Morgan, he (said Morgan) paid said single bill, due on the 14th day of April, 1876. That, at the time of said as-

signment and notice thereof to the said Morgan, he had not paid said Totten said last-mentioned single bill, or any part of it, nor had he paid at that time to said Totten more than one-half of said single bill due on the 14th day of October, 1875; and that the said single bill for three hundred and twenty five dollars had not been paid nor any part thereof, to said W. G. L. Totten before notice of said assignment was given to said Morgan, or to the said Elias Heavner during his lifetime, or to the plaintiff since the death of the said Elias Heavner. That said Elias Heavner died in 1884, having made his last will and testament, by which he appointed the plaintiff his executor, who has qualified as such. And he prays as in his original bill he has prayed.

The defendant Morgan answered the plaintiff's bill, admitting the statements and allegations therein contained as to the manner in which the title of the said lot No. 14 was derived by Leonard Crites from the state, and also as to the manner in which the title of a portion of said lot 14, adjoining lots 13 and 23 and 24, was conferred upon the said two sons of Leonard Crites, and passed from them to Thomas Selby, also as to the sale of said tract as the property of said Selby under a decree of the court and its purchase by said Totten, and his purchase of the same from said Totten, and the execution of his bonds for the purchase money; but he denies the allegations with reference to the purchase within the interlock except as to the fourteen acres next to lot 13, which he says was taken by mistake. He denies that C. W. Heavner, son of Elias Heavner, asked him if he should buy the single bill for three hundred and twenty five dollars from W. G. L. Totten for his father, if defendant would have any objection, and thereupon he (Morgan) said that said single bill was all right, or that he informed C. W. Heavner at any time that said single bill was all right; but alleges that, in all conversations with said C. W. Heavner concerning said single bill, he informed him there was a deficiency in the quantity of the land he had purchased from Totten, and he wouldnot pay said bond or single bill. He also denies that Elias Heavner notifiedhim in January,

1876, that Totten had assigned to him said single bill, or that he had notice of such assignment prior to his payment of the single bill due the 14th day of April, 1876; and he denies that he paid to W. G. L. Totten said single bill due the 14th day of April, 1876, or any part thereof, and says that, by arrangement with said Totten, he was to pay said purchase money to C. C. Higginbotham, commissioner in the suit of A. B. Clark v. Thomas Selby; that on the 14th day of June, 1876, before said bond for three hundred and twenty five dollars was due, said commissioner instituted in the County Court of Upshur county a chancery suit to enforce the payment of the purchase money due to him from Totten on said land, and it then became necessary for him to apply or see to the application of the purchase mon. ey then due from him to Totten to the payment of the money then due from Totten to said commissioner; and he prays that the cause be referred to a commissioner of the court, in order that he may have the errors in the former survey, and calculations of the amount of land claimed by Fannie Ely, corrected, *etc.;* and he asks that said bond for three hundred and twenty five dollars may be canceled as to him.

Anderson Shingleton also answered, adopting the answer of said Morgan, and claiming that he had been in possession of the four acre-tract in lot 24 since December, 1883, and denies that said four acres ever were in the possession of Leonard Crites, John D. Crites, William M. Crites, or Thomas Selby, or W. G. L. Totten, or the defendant Morgan, or that there ever was any interlock on any portion of said lot 24.

Fannie Hunt Ely also answered said bill, adopting the answer of Morgan. She also denies that Leonard Crites, William M. Crites, Thomas Selby, or Jacob L. Crites, or any person holding under them, ever had possession of any portion of lot 23, or that there was any interlock except what Jacob L. Crites had possession of south of the Buchanan river, containing four or five acres, which was limited to his inclosure, and that he had no deed or other writing for the same, and denies that there was any interlock on any portion of lot 23 until the deed was made by

John D. and William Crites on the 8th of September, 1870, to Thomas Selby, and possession was not delivered under said deed until the spring of 1871.

Walter Phillips, committee for James Ross, a lunatic, also answered said bill, adopting the answer of Morgan Morgan, and putting in issue the allegations of the bill with reference to the alleged interlock on lot No. 13.

By consent of parties, the cause was recommitted to G. M. Fleming, one of the commissioners of the court, who was directed to send the surveyor of lands for the county on the lands in controversy, to do any such additional surveying as the parties in interest might require, and to have said surveyor report his proceedings, with a plat, to him; and said commissioner was directed to take further proof in relation to the lands in controversy, and report thereon to the court.

On the 25th day of January, 1892, said commissioner returned and filed his report, in which he found that the interlock of the land in controversy upon the lands now owned by the defendants James Ross, Anderson Shingleton, and Fanny Hunt Ely, respectively, was created by John McWhortor and Alex S. Withers in the sale to said Ross and to said Ely of land already sold by them to Leonard Crites; that as between Leonard Crites and his grantors, McWhorter and Withers, the latter created the interlock upon lots 13, 24, and 23 as surveyed by Minter Bailey at the time they sold lot 14 to said Crites, they still being the owners of lots 11, 13, 24, and 23. Said commissioner further found that said Crites, having held possession of the fourteen acres of improved land within the interlock since about the year 1851, until he had title to the same by prescription, at the same time claiming title to all the land in the interlock to the extent of his boundary, and said Ross, Shingleton, and Ely not having had possession within the interlock, should be held to be in adverse possession o all the land in the interlock, and his title to the same as to the fourteen acres was perfected by prescription, and that the metes and bounds of the land in controversy are correctly set forth in said Totten's deed, filed with the original bill as Exhibit C, and that said deed does not embrace

land not owned by said Totten at the time of his sale to
Morgan Morgan of the land in controversy, and that said
land contains two hundred and seventeen and one-half
acres surface measure, and two hundred and four and one-
half acres horizontal measure; and he further found that, of
the purchase money from said Morgan on said land, there
remains due and unpaid the bond or single bill calling for
three hundred and twenty five dollars; that the same is now
owned by J. W. Heavner, administrator of said Elias Heav-
ner, and, with its interest, on the 8th of February, 1892, it
amounted to six hundred and sixty two dollars and sixty
seven and one-half cents, and is a lien on the land in con-
troversy.

The defendants filed six exceptions to said commission-
er's report: (1) As to the finding "that the interlock of
the lands in controversy upon lands now owned by defend-
ants James Ross, Anderson Shingleton, and Fanny Hunt
Ely, respectively, was created by John McWhorter and Al-
exander Withers in the sale to said Ross and said Ely of
lands already sold by them to Leonard Crites, they being
still the owners of lots 11, 13, 24, and 23, on the ground
that said McWhorter and Withers never sold and conveyed
any land to said Leonard Crites except lot No. 14 as it lay
in the block of lots of the Davenport survey, and their deed
to Leonard Crites only covered and embraced lot 14 ac-
cording to Minter Bailey's subdivision of the Davenport
survey into lots; (2) to the finding that said Leonard Crites,
having held possession of the fourteen acres of improved
land within the interlock since about the year 1851, until
he had title to the same by prescription, at the same time
claiming title to all the land in the interlock to the extent
of his boundary, and the said Ross, Shingleton, and Ely,
and their grantors not having possession within the inter-
lock, should be held to be in adverse possession of all the
land in the interlock, and his title to the same, as of the
fourteen acres, perfected by possession," on the ground that
said fourteen acres lies within lot 13, and the possession of
said fourteen acres so in lot 13 could in no event apply to
lots 23 and 24, and on the further ground that the evidence
does not warrant that said Leonard Crites ever claimed his

lines to go beyond the lines of lot 14, as it lay in the block of lots in its place in the subdivision of the Davenport survey, and on the further ground that, even if the actual possession of the fourteen acres gave Leonard Crites any right beyond his actual inclosure thereof, said rights could only apply to lot 13, and not to lots 23 and 24; (3) as to the finding that the metes and bounds of the land in controversy are correctly set forth in said Totten's deed filed with the original bill; (4) as to the finding that said single bill for three hundred and twenty five dollars, with its interest, remains due and unpaid, on the ground that there is a deficiency of fifty one and one-half acres in the land sold by Totten to Morgan; (5) on the ground that there never was any interlock on the lands embraced in lots 23, 24, and 13 (except as to said fourteen acres) until the making of said deed from John D. Crites and others to Thomas Selby in September, 1870, and in less than five years thereafter said Morgan Morgan, after his purchase from Totten, learning that said deed embraced land lying within said three lots 13, 24, and 23, and that said Totten claimed to sell to him all the land embraced in said deed, disclaimed title by his purchase from Totten to all lands covered by said deed, in lots 13, 23, and 24, except the fourteen acres; (6) on the ground that the weight of the evidence was for the defendants.

The cause was heard on the 16th day of February, 1892, and the court sustained the exceptions to the reports of Commissioner Fleming, and dismissed the original and amended bills as to the defendants Morgan Morgan, Anderson Shingleton, Fannie Hunt Ely, James Ross, and his committee, Walter Phillips, and gave judgment in favor of Jacob W. Heavner, executor as aforesaid, against said William G. L. Totten, in the sum of six hundred and sixty two dollars and sixty seven and one-half cents, with interest and costs, and directed a deed to be made to said Morgan by said Totten, the description conforming to and following the lines on the plat of Watson Westfall filed in the cause, but including in such deed the small parcel of land containing fourteen acres, shaded green, containing one hundred and fifty three acres horizontal measurement.

From this decree the plaintiff J. W. Heavner, executor, *etc.*, appealed.

The first error relied on is that "the court erred in dismissing the plaintiff's bills, because Morgan Morgan and those under whom he claims had held actual, continuous, and adverse possession of said tract of two hundred and three acres of land, under claim of title to the whole, for more than ten years prior to the institution of said suit." In considering the questions raised by this assignment of error, we look first, at the description contained in the deed from John McWhorter, Alexander S. Withers, and M. Withers to Leonard Crites, a copy of which is filed with the deposition of William M. Crites, as "Exhibit AA," and it is there found that the land is described as "lying in Upshur county, being lot No. 14 in the division of a tract of thirty thousand acres, sold as delinquent and forfeited in the county of Lewis, by the commissioner of forfeited and delinquent lands for said county of Lewis, forfeited in the names of John Davenport and others, the plat constituting part of the record in said cause, now remaining in the office of the clerk of the Circuit Court of Lewis county, as will more fully and at large appear, said lot 14 containing one thousand acres, more or less." And said William M. Crites, in his deposition, says: "It is the land in the plat as No. 14. It embraces the land in controversy in this suit." And when said plat is referred to, which is a part of the record in this case, it is found that said land, from lot 7 to 30, inclusive, was subdivided into rectangular tracts, by lines running parallel with each other, said lot 14 being bounded by lots 13, 23, 15, and 11, and was separated from these lots by straight lines; and a glance at said map at once discloses that the interlocks claimed were caused by a departure from said straight lines, which not only encroached upon the adjoining lot, but, if extended, would derange the entire survey. It is true that Leonard Crites, by mistake went on to a portion of lot No. 13, took possession and improved about fourteen acres, which, to the extent of his inclosure the decree allows him to hold, as has been shown, the said Leonard Crites, by his deed, only took lot No. 14 in the division of the

thirty thousand acre-tract sold as delinquent and forfeited, as aforesaid, and his deed refers to the plat made in that case, said land being forfeited in the name of John Davenport and others. When, therefore, he or those claiming under him went beyond the lines of said lot No. 14, he went without color of title, and his possession must be limited to his inclosure. The characteristics of adverse possession are stated by Hutchinson in his work on Land Titles (page 201) as follows: "It must be (1) hostile or adverse; (2) actual; (3) visible, notorious, and exclusive; (4) continuous; and (5) under a claim or color of title." And in section 389 he defines "color of title" thus: "Color of title is that which has the semblance of title, but which in fact is no title, and is anything in writing, however defective or imperfect, purporting to convey title to the land, and which defines the extent of the claim"—citing *Veal* v. *Robinson*, 70 Ga. 809; *Brooks* v. *Bruyn*, 35 Ill. 394; *Wright* v. *Mattison*, 18 How. 50. And in the next section he says: "A claim of title may exist, and often does exist, without any written or other documentary evidence of title. It may be an entry under a parol agreement or understanding, or without any right except the claim to enter upon the premises as the absolute property of the disseisor. But unless the boundaries of the land entered upon under a claim of title, when there is no writing, are marked and held in actual possession to the extent of such boundaries, the claimant, having no paper giving color of title, can only hold to the extent of his actual inclosure or improvement"—citing *Bradstreet* v. *Huntington*, 5 Pet. 439. When Leonard Crites, then, went beyond the bounds of lot 14, as laid down in the map referred to in the deed he received from McWhorter and Withers, he went without color of title' and must be limited to his actual inclosure, to wit, the fourteen acres, shaded in green. There never was any improvement made by Leonard Crites or those holding under him outside of the lines of lot 14, except the fourteen acres aforesaid and the five and one-half acres marked "Crites, Improvement," which latter was devised to Jacob L. Crites, lies south of the Buchanan river, and forms no part of the land in controversy; and as to both of these small tracts he

was confined to his inclosure. John D. Crites and William M. Crites and others conveyed to Thomas Selby the tract of land in controversy on the 8th day of September, 1870, and by that deed went beyond the lines of lot No. 14, and created the interlock. The land was sold under a decree against Selby, and Totten became the purchaser; and on the 14th day of October, 1874, said Totten sold said land to the defendant Morgan, covenanting to convey with covenants of general warranty. Said Morgan, for the first time, in 1875, discovered that the deed to Selby called for land outside of the bounds of lot No. 14, and at once disclaimed title to any land outside of the boundaries of lot No. 14, except the fourteen acres shaded in green, on account of the defect in the title, and refused to pay the bond for three hundred and twenty five dollars, with interest.

In the case of *Koger* v. *Kane's Adm'r*, 5 Leigh, 606, it was held that "the jurisdiction of a court of equity to enjoin the collection of purchase money of land, after conveyance executed, on the ground of deficiency in quantity, the contract being a sale by the acre, is not now to be questioned." In Virginia, "equity will enjoin the collection of purchase money of land on the ground of defect of title after vendee has taken possession under conveyance from vendor with general warranty, if the title is questioned by a suit either prosecuted or threatened, or if the purchaser can show clearly that the title is defective." See, also, *Clark* v. *Hardgrove*, 7 Gratt. 399. See, also, *Renick* v. *Renick*, 5 W. Va. 285. So, also, in the case of *Johnston* v. *Jarrett*, 14 W. Va. 238, it was held that, where a vendor has bound himself to convey the land with covenants of general warranty, he is responsible for defects of title to any part of the land so sold; and a court of equity will not compel the payment of the whole of the purchase money until the defect is removed, although there has been a conveyance of such land to the vendee.

It is alleged in the amended bill that on the 11th day of October, 1875, C. W. Heavner, the son of said Elias Heavner, asked the said Morgan Morgan, if he should buy said single bill for three hundred and twenty five dollars from the said W. G. L. Totten for his father, if he (the said Mor-

gan) would have any objection, and thereupon the said Morgan said said single bill was all right; and that on the 14th day of October, 1875, said Totten, for and in consideration of the full face value of said single bill, assigned the same to said Elias Heavner; and it is claimed that said Morgan is estopped from denying the validity of said single bill or avoiding its payment. The only witness that supports this allegation is C. W. Heavner, a son of said Elias Heavner, who says that Morgan told him before the assignment that he would as soon pay the bond to Elias Heavner, his father, as to Totten, and that the bond was all right; and that Morgan showed him some two year old cattle which he expected to come in next year to pay the same. Elias Heavner, however, states that said Morgan told him there was a lap of the land; that he for a while talked as if he would pay him part, and finally said he would not pay any, and then he brought suit, but Morgan still contended there was a lap of the land. The testimony of J. W. Heavner as to conversations with said Morgan evidently refers to a date subsequent to the time said single bill was purchased by Elias Heavner, and after the single bill became due, in which he said the bond was correct, and would be paid when he collected money from Totten and Smith. And in the second deposition he states that in his first conversion with said Morgan he did not say anything about there being a lap of the land, and he then made no objection to paying the bond; that he never told him anything about there being a lap of the land until long after the first conversation in regard to said bond. Morgan Morgan, however, states in his deposition that he learned from the Criteses that their father had bought lot 14 of the Davenport survey, and that he was lying inside of that lot before he made the purchase, and that, when he bought from said Totten, he thought he was buying inside of said lot No. 14, and he did not find out that the land he purchased from Totten extended beyond lot No. 14 until the next spring, so that the conversation spoken of by J. W. Heavner might easily refer to a time anterior to his (Morgan's) knowledge of the interlock; and, when this was ascertained, said Totten made an effort to purchase from

Ross and Ely the interlap; and said Morgan denies the conversation detailed by C. W. Heavner and J. W. Heavner, saying that he informed C. W. Heavner at the time he spoke of trading for the note that he had found out there were two laps of land that was claimed by other parties, and that he would not pay the money until that incumbrance was removed, and that he had a conversation with J. W. Heavner, another son of said Elias, after said note had been purchased, which was the same in substance.

My conclusion, therefore, is that the plaintiff has failed to show such a state of circumstances as would estop the defendant Morgan from setting up a failure of consideration as to said single bill. It is shown by the testimony that said Totten is insolvent, and the only protection left to the defendant Morgan is to withhold the purchase money until the defect in the title is removed. See *Renick* v. *Renick*, 5 W. Va. 285; *Koger* v. *Kane's Adm'r*, 5 Leigh, 606; *Sutton* v. *Sutton*, 7 Gratt. 234. In this case there was a title bond in which Totten agreed to convey this land, with covenants of general warranty; and in the case of *Renick* v. *Renick*, *supra*, there was a defect in the deed, and the bonds for the purchase money had been assigned. The court, in its syllabus, says: "The defect in the title is clear and admitted, and, under the peculiar circumstances of this case, it would be unreasonable to restrict the vendee to his covenants of general warranty, and compel him, with the admitted defect and failure of title, to discharge the whole of his purchase money, and to risk the hazard of the solvency of his vendor's estate after his decease."

The title bond from said Totten to Morgan in this case described the land as containing 203 acres; and in *Crislip* v. *Cain*, 19 W. Va. 441 (fifteenth point of syllabus) this Court held that "the vendee of land has a right to rely on the statement of the vendor as to the number of acres in a tract of land which he sells, and naturally does rely upon it; and, as the quantity of land is generally a material matter in the purchase of a tract of land, it ought, *prima facie* to be regarded that the vendee was induced to pay or agreed to pay the price named in the contract or deed because of the statement in it by the vendor of the number of acres, which

statement, if positive, should be regarded as a statement made on the personal knowledge of the vendor; and therefore, in the absence of all other proof, the vendor must be regarded as guilty of fraud on the vendee; and a court of equity should, for this reason, require the vendor to make a proportionate abatement from the purchase money." See, also, *Clarke* v. *Hardgrove,* 7 Gratt. 399.

Taking into consideration the facts disclosed by the testimony in this case, and viewing them in the light of the authorities cited, our conclusion is that the Circuit Court committed no error in the decree complained of, and the same must be affirmed, with costs and damages.